# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SANDRA WEBER                                          Civil No. 07-0094 (JRT/AJB)

        Plaintiff,

v.                                                   **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE
Commissioner of Social Security,

        Defendant.

_____

     Jennifer Mrozik, 1611 W. County Road B, Suite 106, PO Box 130938, Roseville, MN 55113, on behalf of Plaintiff.

     Lonnie F. Bryan, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, on behalf of Defendant.

_____

     Plaintiff Sandra Weber, ("Ms. Weber") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied her application for a period of disability and disability insurance benefits. See, 42 U.S.C. § 1382 (c). This Court has appellate jurisdiction over the claim pursuant to 42 U.S.C. § 405(g). This matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. The parties have submitted cross-motions for summary judgment. [Dockets # 12 and # 15]. For the reasons set forth below, this Court recommends that Defendant's motion for summary judgment [Docket # 15] be granted and the Commissioner's decision be affirmed.

## I.  INTRODUCTION

Ms. Weber reportedly injured her back after a car accident in 1994. Ms. Weber first alleged that she became unable to work as of December 31, 1991 due to lower back pain and migraine headaches. (Tr. at 58-60; 141, 387-390.) Ms. Weber's insured status for disability insurance benefits expired on December 31, 1992. (Tr. at 61.) At the ALJ hearing, Ms. Weber stated that she would be withdrawing her application for disability insurance benefits and amended her onset date to January 1, 2003.[1]

## II.  STATEMENT OF FACTS

1.      Procedural Background

Ms. Weber filed an application for Supplemental Security Income on December 22, 2003 and filed applications for a period of disability and disability insurance benefits on December 23, 2003.  (Tr. at 17.)  In both applications, Ms. Weber alleged disability beginning January 1, 2000. (Tr. at 17.) The applications were denied initially on July 7, 2004 and upon reconsideration on September 29, 2004. (Tr. at 17.)  Ms. Weber requested a hearing before an Administrative Law Judge on September 29, 2004. (Tr. at 17.) A hearing was held before Administrative Law Judge Roger Thomas on April 10, 2006 in Minneapolis, Minnesota.  (Tr. at 17.)  On June 8, 2006, the ALJ issued an unfavorable decision against Ms. Weber. (Tr. at 15-28.)

---

[1]In order to be eligible for disability insurance benefits, a claimant must prove that they were disabled prior to the expiration date of their insured status. See 42 U.S.C.§ 416(i)(2); 20 C.F.R.§ 404.1505(a); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Upon applying his factual determinations to the evaluation sequence required by Social Security Administration regulations, the ALJ concluded that: (1) the claimant met the insured status requirements of the Act through December 31, 1992 and was not insured for disability insurance benefits on January 1, 2003, her amended alleged disability onset date; (2) the claimant has not engaged in substantial gainful activity at any time relevant to this decision; (3) the claimant is severely impaired by a history of myofascial neck and back pain, degenerative disc disease of the lumbar spine, migraine headaches, degenerative joint disease of the bilateral knees, obesity, asthma, hypothyroidism, depression and chronic pain syndrome; (4) the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, subpart P, Appendix 1; (5) the claimant retains the residual functional capacity to perform a light level of work involving lifting twenty pounds occasionally, frequently lifting up to ten pounds; standing and/or walking for up to six hours in an eight-hour workday; sitting for up to six hours in an eight-hour workday; only occasional overhead work; only occasional bending, twisting, kneeling, crouching, and crawling; in an environment with no high concentrations of pollutants; performing tasks that are simple and unskilled in nature; and with only brief and superficial contact with coworkers, supervisors and the public; (6) claimant is unable to perform any past relevant work; (7) claimant was born on March 20, 1966, and was 36 years old on the amended disability onset date, which is defined as a younger individual 18-44; (8) claimant has at least a high school education and is able to communicate in English; (9) claimant's past relevant work is unskilled; (10) considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that

exist in significant numbers in the national economy that the claimant can perform; (11) the

claimant has not been under disability as defined in the Social Security Act, from January 1,

2000, through the date of this decision.  (Tr. at 19- 27.)

The Social Security Administration Appeals Council denied a request for further review

by notice dated June 8, 2006. (Tr. at 7-9.)  The denial of review made the ALJ's findings the

final decision of the defendant.  42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822

(8th Cir. 1992); 20 C.F.R. § 404.981. Ms. Weber initiated review of this action on January 8,

2007 [Docket # 1]. The appeal to this court was brought pursuant to 42 U.S.C. §405 and §423.

An Order of Enlargement of Time was granted to Ms. Weber on May 21, 2007. [Docket # 11]

She filed her Motion for Summary Judgment on May 31, 2007. [Docket # 12]  The

Commissioner filed its Motion for Summary Judgment on July 16, 2007. [Docket # 15].

2.    Medical Evidence

Ms. Weber injured her back after a car accident in 1994. She received treatment through

April 1997 from United Hospital. (Tr. at 189-96.) Ms. Weber then sought treatment from Rachel

Frazin, a nurse practitioner from Allina Medical Clinic and Dr. Jimmie Browning, M.D. (Tr. at

198-237; 314-347.)

On June 7, 2002, Dr. Browning saw Ms. Weber for complaints of headaches. (Tr. at 225.)

Dr. Browning indicated that it was a muscle contracture headache. (Tr. at 225.) He also notes in

the record that Ms. Weber would jump and complain even before he would touch her shoulders.

He also states that she had exaggeration of her symptoms which made him suspicious of

secondary gain such as narcotics. (Tr. at 225.) Dr. Browning told Ms. Weber that her complaints did not warrant taking narcotic medication. (Tr. at 225.)

On August 12, 2002, Ms. Weber was referred to United by Ms. Frazin for evaluation of her headaches. (Tr. at 187.) Ms. Weber stated that she experienced two to three headaches a week and that she went to the emergency room three to four times a month. (Tr. at 187.) She was introduced to the basic principles of biofeedback. (Tr. at 188.)

On May 5, 2003, Ms. Weber's MRI showed a mild disk hydration with a small central disk protrusion. (Tr. at 242.) On May 28, 2003, Ms. Weber was taking Imitrex and Inderal for her headaches and she was satisfied with her control of the headaches. (Tr. at 210.)

On October 22, 2003, Ms. Frazin saw Ms. Weber for headaches and low back pain, and Ms. Frazin changed her medication. (Tr. at 205.) On November 12, 2003, Ms. Weber indicated to Ms. Frazin that the new medication did not help with her headaches. (Tr. at 203.) Ms. Frazin increased the medication and encouraged Ms. Weber to return to pool therapy and start to walk more often. (Tr. at 203.)

On December 10, 2003, Ms. Weber went to United at the request of Ms. Frazin. (Tr. at 183-86.) Ms. Una Edwardson reported no significant objective findings on examination. (Tr. at 184.) Ms. Edwardson noted that Ms. Weber had subjective tenderness over her hips which suggested a "touch me not type" demeanor. (Tr. at 184.) Ms. Edwardson stated that Ms. Weber had subjective pain in her left low back, but that her reflexes and strength were normal. (Tr. at 184.) Ms. Edwardson indicated that Ms. Weber had reported that her headaches were

significantly improved since taking Effexor and Methadone. (Tr. at 185.) Ms. Edwardson suggested trying Relpax and referred her to Dr. Kioski. (Tr. at 185.)

On December 17, 2003, Diane Bakdash examined Ms. Weber and noted that Ms. Weber did not find Relpax to be helpful to her headaches. (Tr. at 181.) Ms. Bakdash recommended different medications for Ms. Weber's headaches, including Bextra. (Tr. at 181-82.)

Dr. Kioski saw Ms. Weber on January 9, 2004 for her headaches. (Tr. at 179-80.) Ms. Weber stated she had no headaches since taking Bextra. (Tr. at 179.) Dr. Kioski noted that Ms. Weber had a restricted range of motion and tenderness of the back. (Tr. at 179-80). He recommended facet block injections for Ms. Weber's back and noted that Ms. Weber's headaches were doing well on Bextra. (Tr. at 180.)

Dr. Steven Weber performed the facet joint injection on Ms. Weber and noted that an MRI of Ms. Weber's back was "fairly benign" with some mild disk dehydration and a small central disk protrusion. (Tr. at 177.)

On February 13, 2004, Ms. Bakdash noted that Ms. Weber denied any improvement of her back with the facet joint injection and Ms. Weber stated that she did not "want anybody near my back". (Tr. at 175.) Ms. Weber indicated that she started pool therapy, but stated that the chlorine triggered her headaches and that she ran out of one of her medications, Axert. (Tr. at 175.) Dr. Bakdash reminded Ms. Weber to exercise on a regular basis as much as possible. (Tr. at 176.)

On April 2, 2004, Dr. Gerald Morley, a neurologist, examined Ms. Weber for complaints of persistent headaches and neck pain. (Tr. at 257-260.) Ms. Weber scaled her headaches as

being usually a 2 to 3 out of 10. (Tr. at 257.) Dr. Morley reported no impairment of recent or

remote memory or attention and concentration. (Tr. at 258.) He indicated that Ms. Weber had 5/5

motor strength, normal reflexes, difficulty toe and heel walking, no muscle atrophy, no sensory

deficits, restricted range of motion of the neck and back, and tenderness of the back. (Tr. at 259 -

260.) Dr. Morley diagnosed post-traumatic headaches and neck and lower back sprain or strain.

(Tr. at 260.) He recommended an MRI of her head and gave her some headache medication. (Tr.

at 260.)

The MRI performed on April 6, 2004, showed no abnormalities (Tr. at 256.) An MRI of

Ms. Weber's cervical spine showed "minimal" posterior disc bulges, but no cord compression or

evidence of nerve root impingement. (Tr. at 254.)

In May 2004, a state agency physician reviewed the record and concluded that Ms.

Weber could lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk for

about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. at 285-

92.)

On June 4, 2004, Dr. Morley changed Ms. Weber's medication to nortriptyline. (Tr. at

251.) Dr. Morley noted no mental abnormalities. (Tr. at 251.) He also reported normal motor

strength, no sensory deficits, normal gait and station, and restricted range of motion of the neck

and back. (Tr. at 252.) He diagnosed headaches which Axert alleviated. (Tr. at 252.) Dr. Morley

noted that Ms. Weber should be increasing her activity levels. (Tr. at 252.)

On June 10, 2004, Dr. Karayusuf examined Ms. Weber at the request of a state agency.

(Tr. at 158-160.) Dr. Karayusuf indicated that Ms. Weber had complained of back pain and

migraine headaches since 1994. (Tr. at 158.) Ms. Weber stated that she became depressed in

2001 after a car accident that worsened her condition. (Tr. at 158.) She denied any thought of

suicide or psychiatric hospitalizations. (Tr. at 158.) She complained of diminished concentration

and memory, feelings of uselessness, worthlessness, and anxiety. (Tr. at 158.) Dr. Karayusuf

noted that Ms. Weber's daily functioning included cooking for herself and family, shopping

every two weeks, driving occasionally, dusting and vacuuming once a week with several breaks

due to pain and doing the laundry. (Tr. at 159.) On the mental status exam, Dr. Karayusuf

diagnosed Ms. Weber with dysthymia and stated that Ms. Weber could understand, retain, and

follow simple instructions, but she was restricted to brief superficial interactions with coworkers,

supervisors, and the public. (Tr. at 159.)

    In her notes dated June 14, 2004, Ms. Bakdash noted that Ms. Weber did some

housework and laundry during the day and studying. (Tr. at 172.) She would exercise by walking

her dog in the evening. (Tr. at 172.) Ms. Bakdash informed Ms. Weber to engage in regular

exercise.

    On June 24, 2004, Ms. Bakdash saw Ms. Weber again for her headaches and low back

pain. (Tr. at 169.) Ms. Bakdash noted that Ms. Weber walked her dog a few times a week and

Ms. Weber indicated that she did not feel the need to see her psychiatrist. (Tr. at 169.) She also

stated that she had experienced only four headaches in the past month. (Tr. at 169.)

    On July 1, 2004, Dr. Sharon Frederiksen, a state agency psychologist, reviewed the

record and concluded that Ms. Weber had the ability to sustain an ordinary routine without

special supervision, had the ability to tolerate the stressors of a routine, repetitive three and four

step work setting, and had a mild to moderate impairment to interact and get along with coworkers and the public. (Tr. at 261-65, 271-84.) Dr. Frederiksen indicated that Ms. Weber did not have a medically determinable mental impairment at the time her insured status expired, December 31, 1992. (Tr. at 271.) Dr. Owen Nelson also reviewed Ms. Weber's record and concurred with Dr. Frederiksen's opinion. (Tr. at 271.)

On July 2, 2004, Dr. Kioski saw Ms. Weber for a follow-up on her headaches and low back pain. (Tr. at 166-67.) He noted that Ms. Weber recently saw Dr. Morley for her headaches and she was currently taking Depakote and Nortriptyline. (Tr. at 166.) She told Dr. Kioski that she was bothered by low back pain. (Tr. at 166.) Dr. Kioski diagnosed lumbar degenerative disk disease and indicated that it was unclear whether the MRI findings correlated with her pain. (Tr. at 167.) Dr. Kioski recommended an epidural steroid injection and a Duragesic patch for the pain. (Tr. at 167.)

On July 15, 2004, Dr. Kioski completed a form in which he stated that Ms. Weber could life 20 pounds occasionally and 10 pounds frequently; stand or walk for 2 hours in an 8 hour workday and one-half hour at a time; sit for 6 hours in an 8-hour workday and one-half hour at a time; and never stoop, crouch, kneel or crawl. (Tr. at 293-96.) Dr. Kioski indicated that his limitations were "estimates" and recommended a functional capacity evaluation to assess more accurate limitations. (Tr. at 293.)

On July 18, 2004, Ms. Frazen completed a form evaluating Ms. Weber's ability to do various mental work-related activities. (Tr. at 266-69.) She indicated that Ms. Weber had the ability to perform most work-related activities at a level that was more than satisfactory or

limited but satisfactory ability . He ability to deal with work stresses was seriously limited, but not precluded. (Tr. at 266-67.)

On August 4, 2004, Ms. Bakdash noted that Ms. Weber was feeling better with the Duragesic patch (Tr. at 163.) Ms. Weber was exercising by walking her dog about three days a week. (Tr. at 163.)

Dr. Angelito Sajor examined Ms. Weber for complaints of low back pain radiating to her left leg on August 10, 2004. (Tr. at 161.) Dr. Sajor noted that Ms. Weber had a normal gait, tenderness of the back with range of motion; negative straight leg raising; good motor strength; no sensory deficits; and normal reflexes. (Tr. at 161.) Dr. Sajor noted that Ms. Weber's symptoms were not consistent with the MRI and he recommended an EMG of the legs. (Tr. at 161.) Dr. Sajor noted that Ms. Weber refused to have the epidural steroid injection. (Tr. at 161.)

On September 10, 2004, Dr. Morley saw Ms. Weber for severe headaches, as well as neck and back pain. (Tr. at 249-250.) Dr. Morley renewed the prescription for nortriptyline, Depakote and Axert. (Tr. at 250.) He changed her medications again on November 12, 2004.

On December 15, 2004, Ms. Frazin noted that Ms. Weber primarily relied on narcotic medications for her treatment. Ms. Frazin noted that she would try and find a psychotherapist for Ms. Weber and recommended that she do yoga. (Tr. at 345- 46.)

On January 12, 2005, Ms. Frazen indicated that Ms. Weber asked her to complete a form indicating that she was unable to work. (Tr. at 343.)

On March 28, 2005, Ms. Frazin saw Ms. Weber and noted that she was doing well with the medications and had no new complaints about her back pain. (Tr. at 339.) Ms. Frazin recommended Ms. Weber to become more active. (Tr. at 339.)

On March 29, 2005, Dr. Morley saw Ms. Weber and noted that her headaches were diminished until she started decreasing Depakote. (Tr. at 307.) Dr. Morley recommended an MRI of the lower back. (Tr. at 307.) On examination, Dr. Morley reported no sensory deficits, restricted range of motion of the back, moderate muscle spasm, some difficulty with toe walking, normal reflexes and normal coordination, gait, and station. (Tr. at 307-08.) An MRI showed no disc herniating or significant change since 1994. (Tr. at 304.)

On April 28, 2005, Ms. Frazin noted that MS. Weber reported a significant reduction in pain with medication. (Tr. at 338.)

On September 1, 2005, Ms. Frazin noted that Ms. Weber experienced right knee pain after she helped tar a roof. (Tr. at 325.)

On April 4, 2006, Ms. Frazin completed a functional assessment form in which she stated that Ms. Weber could lift 5 pounds occasionally and 2 pounds frequently; stand or walk 10 minutes at a time; and sit for 6 hours in an 8-hour workday or 30 minutes at a time (Tr. at 351-54.) She stated that Ms. Weber could never climb, stoop, couch, kneel or crawl due to Ms. Weber's "myofascial paralumbar pain syndrome". (Tr. at 353.)

3.     Medical Expert's testimony

Dr. Andrew Steiner reviewed the medical records and testified at Ms. Weber's administrative hearing. (Tr. at 47, 425.) He stated that Ms. Weber's limitations included being

able to perform the lifting requirements of light work (Tr. at 427.) He also stated that Ms. Weber would be limited to occasional overhead work; occasional bending, twisting, kneeling, crawling, and crouching. (Tr. at 427.) He testified that he had no reason to believe that Ms. Weber did not experience headaches at the frequency she alleged and that she had been receiving reasonable and necessary medical treatment. (Tr. at 429.)

      4.    <u>Vocational Expert's Testimony</u>

Mr. Norman Mastbaum testified as a Vocational Expert at the ALJ hearing. (Tr. at 429.) The ALJ asked him a hypothetical question regarding the existence of jobs available to a person of Ms. Weber's age, education, and experience given the following impairments and limitations: lifting 20 pounds occasionally and 10 pounds frequently; standing or walking up to 6 hours in an 8 hour workday; sitting for up to 6 hours an 8 hour workday; no more than occasional bending, twisting, kneeling, crawling, or crouching; and no exposure to high concentrations of pollutants. (Tr. at 430.) The ALJ further clarified that the hypothetical individual was restricted to simple, unskilled work that entailed no more than brief, superficial contact with other people. (Tr. at 430-31.) Mr. Mastbaum concluded that the hypothetical individual could not perform Ms. Weber's past work as a food worker, but she could perform other work as a room service clerk, machine tender and press operator or tender. The vocational expert testified that all of those potential jobs have many jobs available in the region. (Tr. at 432.)

      5.    <u>Plaintiff's Testimony</u>

Ms. Weber testified that she had migraine headaches. (Tr. at 415.) She indicated that her migraines were unpredictable and that she would experience one to five headaches a week. (Tr.

at 415.) She also stated that she had neck and back pain. (Tr. at 418.) Ms. Weber is being treated

through antidepressants for her depression. (Tr. at 417.) Ms. Weber stated that she was able to

walk one or two blocks with a cane. (Tr. at 412.) She is able to drive, although she occasionally

has difficulty driving due to knee pain. (Tr. at 411.)

    6.    The ALJ's decision

    The ALJ went through the five-step sequential evaluation process in determining whether

Ms. Weber is disabled.

    The process begins with a determination of whether Ms. Weber has engaged in

substantial gainful activity, as defined in the Regulations, at any time since January 1, 2003, the

alleged onset date of the disability. The ALJ first determined that Ms. Weber has not worked in

substantial gainful activity at any time relevant to the ALJ's decision. (Tr. at 19.)

    The next step in the evaluation process required a determination as to whether Ms. Weber

is subject to any severe physical or mental impairment. A severe impairment is defined as one

that significantly limits the individual's physical or mental ability to meet the basic demands of

work activity. 20 C.F.R. § 404.1520(c), § 404.1521, § 416.920(c) and § 416.921. The ALJ found

Ms. Weber to be severely impaired by a history of myofascial neck and back pain, degenerative

disc disease of the lumbar spine, migraine headaches, degenerative joint disease of the bilateral

knees, obesity, asthma, hypothyroidism, depression and a chronic pain syndrome. (Tr. at 20.)

    The third step requires a comparison of Ms. Weber's severe impairments with the

impairments contained in Appendix 1 to Subpart P of the Regulations. 20 C.F.R. § 404.1520(d)

and § 416.920(d). Appendix 1 contains a Listing of Impairments which describes the required

level of severity for each condition. If the required severity is met, the claimant is found to be disabled. The ALJ found that based on the evidence and the testimony of Dr. Steiner, Ms. Weber does not have an impairment or combination of impairments that meet or equals the relevant criteria of any listed impairment. (Tr. at 20.)

The ALJ then proceeded to the next step to determine as to whether Ms. Weber has the residual functional capacity to perform her past relevant work or any other work existing in significant numbers in the national economy.

The ALJ found that Ms. Weber has the residual functional capacity to perform light work; with lifting twenty pounds occasionally, and ten pounds frequently; standing and walking for up to six hours our of an eight hour day; sitting for up to six hours out of an eight hour day; with only occasional overhead work; only occasional bending, twisting, kneeling, crouching, and crawling; in an environment with no high concentrations of pollutants; performing tasks that are simple and unskilled in nature; and with only brief and superficial contact with coworkers, supervisors and public.

The next step in the sequential evaluation involved a determination as to whether the claimant could return to any of her past relevant work. This determination requires consideration of vocational factors. The neutral vocational expert in this case stated that the claimants past relevant work as a food worker could not be performed. However, it was found that the claimant could perform a number of jobs which are available in the Minnesota and national economy.

Based upon his analysis of the five-step process for determining if a claimant is disabled, the ALJ found that the claimant did not meet the statutory criteria for a finding of disability.

### III.  STANDARD OF REVIEW

Section 205(g) of the Social Security Act authorizes judicial review of the Commissioner's final decision. 42 U.S.C. §405(g). When the Appeals Council denies the review, the ALJ's decision stands as the final decision of the Commissioner. 20 C.F.R.§ 416.1481. The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Thus, judicial review is limited to determining whether substantial evidence supported the ALJ's findings and whether the ALJ applied the correct legal standards in reaching its decision. See Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).

Substantial evidence is more than a "mere scintilla" of evidence but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). The reviewing court does not try cases de novo, resolve conflicts in the evidence, or decide questions of credibility. See Naber v. Shalala, 22 F.3d 186, 188 (8th Cir. 1994); Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). If substantial evidence supports the ALJ decision, it must be affirmed; the decision may not be reversed simply because substantial evidence might also support a different conclusion. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). Judicial review of defendant's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  42 U.S.C. §405(g); Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994).  Where such evidence exists, a court is required to

affirm defendant's factual findings.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

However, in reviewing the record for substantial evidence, the Court may not substitute its own

judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

The analysis conducted by the court must include evidence in the record which detracts

from the weight of the evidence supporting the ALJ's decision.  Burress v. Apfel, 141 F.3d 875,

878 (8th Cir. 1998); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir., 1987).  Thus, the court

must consider the weight of the evidence in the record and apply a balancing test to evidence

which is contrary.  Gavin, 811 F.2d at 1199.

The Court is required to review the administrative record as a whole and to consider:

1.      The credibility findings made by the ALJ;

2.      The education, background, work history, and age of the plaintiff;

3.      The medical evidence provided by treating and consulting physicians;

4.      The plaintiff's subjective complaints and descriptions of pain,

        impairment, and physical activity;

5.      Any corroboration of plaintiff's impairments by third parties; and

6.      The testimony of vocational experts based upon proper hypothetical questions

setting forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989) (citing Brand v. Secretary of HEW,

623 F.2d 523, 527 (8th Cir. 1980)).

## IV.   LEGAL FRAMEWORK

A claimant seeking disability insurance benefits bears the burden of proving that she is

disabled within the meaning of the Social Security Act. 20 C.F.R. § 416.912(a); <u>Young v. Apfel</u>,

221 F.3d 1065, 1069 n.5 (8th Cir. 2000). In order to establish disability, a claimant must

establish the existence of a medically determinable physical or mental impairment that can be

expected to result in death or that has lasted or can be expected to last for a continuous period of

at least twelve months.

The Social Security program provides benefits to people who are aged, blind, or who

suffer from a physical or mental disability."  42 U.S.C. § 1382(a); <u>Locher v. Sullivan</u>, 968 F.2d

725, 727 (8th Cir. 1992).  Disability means that the claimant is unable to work by reason of

"medically determinable" physical or mental impairment or impairments.  42 U.S.C.

§1382c(a)(3)(A).  The term "disability" is defined by the Social Security Act, 42 U.S.C. § 423

(d)(1)(A), as the:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.
>
> <u>Id.</u>

The impairment must be so severe that the plaintiff not only cannot do the work he or she

did before, but also cannot do any other kind of substantial gainful work.  <u>Id.</u> at §1382c(a)(3)(A).

The impairment must last for twelve months or be expected to result in death.  <u>Id.</u> The Social

Security Regulations require the Administrative Law Judge to apply a five-step sequential

evaluation process in determining whether the claimant is disabled. 20 C.F.R. §404.1520. The

steps, in order, are:

    1.      Is the claimant working in substantial gainful employment? Id. at §

          404.1520(b);

    2.      Does the claimant have a medically determinable impairment or

          combination of impairments which is severe? Id. at § 404,1520(c).

    3.      Does the severe impairment or combination of impairments meet or equal

          in severity the listing of impairments? Id. at § 404.1520(d).

    4.      Does the claimant have the capacity to do her past relevant work? Id. at §

          404.1520(e).

    5.      If the claimant cannot perform past relevant work, does the claimant have

          the capacity to do any other work existing in significant numbers in the

          national economy on a sustained, competitive level? Id. at §404.1520(f).

        If at any time in evaluating the claimants disability claim under the five-step process it is

determined the claimant is or is not disabled, the analysis is at an end. Id. at § 404.1520(a).

Plaintiff must then demonstrate that her impairments render her unable to engage in any

substantial gainful activity. 42 U.S.C. § 1382c(a)(3). If a claimant has an impairment that meets

or is equal to an impairment in the listings, the claimant is considered disabled without

consideration of age, education, or work experience. 20 C.F.R. § 404.1520(d). If a claimant does

not meet or equal a listed impairment, the ALJ must next consider the claimant's Residual

Functional Capacity ("RFC") in light of the claimant's past work and determine whether the claimant can still perform that work. Id. at § 404.1520(e)

The claimant bears the burden of proving the existence and severity of any functional limitations caused by her impairments, as well as the burden of proving that her impairment precludes her from performing her past relevant work. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). If she meets that burden, the burden shifts to the Commissioner to establish that the claimant retains the RFC to perform other work and that such work exists in substantial numbers in the national economy. 20 C.F.R. § 404.1520(g)(1); Young, 221 F.3d at 1069 n.5.

## V.  CONCLUSIONS OF LAW

In this present case, Ms. Weber argues that the ALJ substituted his own opinion instead of a physician's opinion with regard to Ms. Weber's residual functional capacity and therefore improperly determined her RFC, creating an incorrect hypothetical for the vocational expert based on that faulty RFC. Ms. Weber also argues that ALJ Thomas failed to follow proper principles of law in determining Weber's credibility. Ms. Weber's final argument is that the vocational expert failed to reference the SCO and thus the ALJ's decision is not based on substantial evidence on the record as a whole.

A. The ALJ Properly Evaluated the Medical Evidence

Ms. Weber first argues that ALJ Thomas did not rely on any physician's medical opinion in his decision and substituted his own lay opinion with regard to Weber's residual functional capacity. (Tr. at 25-26.) The law states that when a physician renders an evaluation of a person's

ability either to do prior work or to perform other positions based upon her physical or mental impairments, that evidence should be carefully considered by the Commissioner. See Turpin v. Bowen, 813 F.2d 165, 172 (8th Cir. 1987). However, the ALJ does not need to give controlling weight to the conclusions of a medical physician if its conclusion is not supported by evidence in the record or is merely conclusory. 20 C.F.R. § 416.927(d)(2); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (treating physician's statements were conclusory).

In this case, the ALJ indicated that significant weight was not given to Dr. Kioski's and Ms. Frazin's assessments because their opinions were not supported by objective findings and were based largely upon Weber's own report of symptoms. (Tr. at 25.)  The regulations address the weight to be given to opinion evidence. 20 C.F.R. § 404.1527(d)(1) states "[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." The regulations also state that "[g]enerally, we give more weight to opinions from your treating sources, since those sources are likely to be he medical professionals most able to provide a detailed, longitudinal picture of your medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations or brief hospitalizations." Id. at (d)(2).

A treating physician's opinion is to be afforded "controlling weight" when the opinion is "well-supported by medically acceptable clinical and laboratory  diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Id.[2]  Generally, the

---

[2] Under the regulations, a "treating source" is a physician, psychologist, or other acceptable medical source who has an "ongoing treatment relationship" with the claimant, i.e., the claimant has seen the physician "with a frequency consistent with accepted medical practice" for the

opinions of doctors who do not examine the plaintiff do not ordinarily constitute substantial evidence to support a finding of non-disability.  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  The ALJ is required to give more weight to the opinion of a treating source versus a non-treating source.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  Even where a treating physician's opinion is not afforded "controlling weight", "a treating physician's opinion should be accorded substantial weight."  Prince v. Bowen, 894 F.2d 283, 285 (8th Cir.1990).

However, "[t]he conclusions of any medical expert may be rejected 'if inconsistent with the medical record as a whole.'"  Davis v. Apfel, 239 F.3d 962, 967 (8th Cir.2001).  An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence...or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.2000)(citation omitted).

In Hacker v. Barnhart, 459 F.3d 934, 939 (8th Cir. 2006), the court stated that the regulations specifically provide that the opinions of non-treating physicians may be considered. See also 20 C.F.R. § 404.1527(f). In Harris v. Barnhardt, 356 F.3d 926, 931 (8th Cir. 2004), the court stated that the ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of an impairment.

Ms. Weber argues that the ALJ did not give enough weight to the opinion of her treating doctors. The evidence of record shows that Dr. Eddie Kioski stated that Ms. Weber is limited to lifting 20 pounds occasionally, ten pounds frequently, standing and walking a total of two hours

---

condition.  See 20 C.F.R. § 404.1502.

out of an eight hour work day, at half hour intervals, sitting six hours total out of an eight hour

work day at half hour intervals and never stooping ,couching, kneeling or crawling. (Tr. at 293-

295.) The ALJ acknowledged her limitations, but also made note of the fact that Ms. Weber

cooks, shops, drives, dusts, vacuums, does laundry, home schools her son, and tries to keep up

with the housecleaning. (Tr. at 21.) The ALJ concluded that Dr. Kioski's evaluations were not to

be given significant weight since they were not supported by the objective findings and

appeared to be based on Ms. Weber's subjective complaints. (Tr. at 25.) Dr. Kioski also

indicated that it was unclear whether Ms. Weber's MRI findings correlated with her pain. (Tr. at

167.) Further, Dr. Kioski only saw Ms. Weber a few times prior to giving his opinion as to her

physical limitations. (Tr. at 179, 293.)

  The ALJ similarly discounted the opinion of Ms. Frazin, one of Ms. Weber's treating

sources.[3] Ms. Frazin completed a functional assessment form in which she opined that Ms.

Weber could lift 5 pounds occasionally and 2 pounds frequently; stand or walk for 40 minutes in

an 8-hour workday; sit for six hours in an 8-hour workday or 30 minutes at a time; and never

climb, stoop, crouch, kneel or crawl. (Tr. at 351-54.) Ms. Frazin also indicated that Ms. Weber

has a very good ability to relate to coworkers and a good ability to work with the public. (Tr. at

21.) However, Ms. Frazin also indicated that Ms. Weber has a serious limited ability to deal with

work stresses. (Tr. at 267.) In response to the question asking what medical findings supported

her opinion, Ms. Frazin stated that Ms. Weber's "myofascial paralumbar pain syndrome"

supported her opinion. (Tr. at 352-53.) In addition, Ms. Frazin's examinations did not involve

---

[3]Ms. Frazin is not an acceptable medical source in general, thus her opinion is not entitled to
significant weight. 20 C.F.R. § 404.1513, 404.1537,416.913, 416.927.

extensive physical examinations. (Tr. at 198-99. 201, 203-06, 208-13, 215, 217, 221, 224, 227-30, 314-18, 320, 323-26, 328, 330, 332, 338-39, 341-43, 345, 347.)

In assessing the weight of the opinions of Dr. Kioski and Rachel Frazin, the ALJ stated that the opinions were not given significant weight since they were not supported by the objective findings and were based on Ms. Weber's own report of symptoms. (Tr. at 25.)  The court finds that the ALJ's opinion is consistent with the medical evidence on record for Ms. Weber. The ALJ's finding was consistent with the opinions of medical sources including with respect to Ms. Weber's physical limitations and  the ALJ's opinion was consistent with Dr. Steiner's medical opinion and Dr. Karayusuf, a psychiatrist who examined Ms. Weber. (Tr. at 159.)

Thus, the ALJ concluded that the treating physician's basis for his findings appear to be largely based on the subjective pain reported by Ms. Weber. Since the ALJ determined that the credibility of Ms. Weber is questionable, the treating physician's opinion was determined to be given less weight.

Ms. Weber argues that the testimony of Dr. Steiner that Ms. Weber's treatment for her headaches was reasonable and necessary suggests that her overall symptoms were believable. However, that statement by itself does not suggest that Ms. Weber's subjective statements should be given their full weight. Dr. Steiner ultimately testified that Ms. Weber could perform a range of light work, even with her limitations. (Tr. at 426 - 27.)

Thus, the ALJ reached the correct decision in choosing to take into account all the medical evidence when making its decision. The treating physician's opinion in this case is not

to be given greater weight due to the fact that the objective evidence fails to support that medical opinion. See 20 C.F.R. § 404.1527(d)(3)-(4) (stating that the better supported and more consistent with the record an opinion is, the more weight assigned to that opinion); see Hacker v. Barnhart, 459 F.3d at 937 (concluding that a treating physicians controlling weight must be supported by reviewing physicians' opinion despite treating physician opinion to the contrary where treating physicians' opinion was not supported by objective findings).

The ALJ correctly concluded that Dr. Kioski and Ms. Frazin's opinions were not supported by objective evidence and were not consistent with other substantial evidence on the record. (Tr. at 22.) [4]

B. The ALJ Properly Evaluated Ms. Weber's Subjective Allegations

Ms. Weber next argues that the ALJ failed to properly evaluate her subjective allegations of disability which violates his duty under Polaski.[5] However, since Ms. Weber is alleging

---

[4] As an additional matter, the ALJ is not required to base his opinion regarding a plaintiff's (RFC) on a specific medical opinion. The ALJ's decision regarding RFC could be supported by substantial evidence even if there is no medical source opinion that directly supports the ALJ's RFC finding. See 20 C.F.R. § 404.1527(e)(2) (stating the ALJ has final responsibility for determining an individual's RFC). A medical source statement is only one of several factors that an ALJ considers in determining an individual's RFC. See, Social Security 96-5p.

[5] Polaski v. Heckler states as follows:

The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;

disability as a result of subjective complaints, the ALJ evaluated the entire record, including the claimant's testimony within the provisions of Polaski v. Heckler. (Tr. at 19.) The ALJ specifically cited the decision in Polaski and made his credibility findings in accordance with Polaski and agency regulations. (Tr. at 19.) In McKinney v. Apfel, the ALJ specifically cited the holding in Polaski while reaching the conclusion that McKinney's complaints were not credible. 228 F.3d 860, 864 (8th Cir. 2000). This is also true in this matter. The ALJ cited to the Polaski factors and took them into account when determining the credibility of Ms. Weber. The ALJ did take into account all the factors in order to reach his decision. The Eighth Circuit has held, however, that an ALJ is not required to discuss each Polaski factor. See Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004); Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

       In this case, the ALJ discussed the objective evidence and noted that Ms. Weber's daily activities were inconsistent with her allegations of a disabling condition (Tr. at 26.) The record showed that Ms. Weber home schooled one of her kids, took classes, helped tar her parents' roof, drove, spent time on the internet and did household chores (Tr. at 86-89, 97, 123, 159, 172, 175, 181, 201, 206, 325, 341, 411.) The ALJ also noted another Polaski factor though by stating that Ms. Weber did not report any on-going side effects from her medication and that her work history suggested a lack of interest to work full-time. (Tr. at 26, 78, 82.)

---

4. dosage, effectiveness and side effects of medication;
5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)(emphasis in original).

Given the record as a whole, the ALJ reasonably concluded that Ms. Weber's subjective complaints were not fully credible. The ALJ's opinions regarding Ms. Weber's credibility is entitled to deference.  The ALJ cited to the <u>Polaski</u> factors and took them into account when determining the credibility of Ms. Weber. The ALJ judge did take into account all the factors in order to reach his decision.

C. <u>The Residual Functional Capacity was Properly Evaluated</u>

A claimant's RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect . . . her capacity to do work-related physical and mental activities."  SSR 96-8p.  The RFC is an assessment of the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis."[6] <u>Id.</u>

The RFC assessment is "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements' - - i.e., opinions about what the individual can still do despite . . . her impairment(s)." <u>Id.</u>  A medical source statement is only one of several factors that an ALJ considers in determining an individual's RFC. SSR 96-5p, 61 Fed. Reg. 34466, 34473.

The ALJ reviewed the record as a whole and reasonably found Ms. Weber capable of performing a range of light work. (Tr. at 20.) The ALJ posed a hypothetical question to the vocational expert incorporating Ms. Weber's vocational profile and all credible work-related

---

[6]A "regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule."  <u>Id.</u>

limitations. (Tr. at 430-31.) This court finds that the ALJ properly took into account the opinions of all the physicians, including Dr. Steiner. This court finds that the ALJ properly determined the credibility to Dr. Steiner's testimony and relied upon it correctly for his decision. In <u>Cox v. Barnhart</u>, the court determined that the ALJ was in a better position to evaluate credibility and thus deferred to the ALJ's findings as long as they were supported by good reasons and substantial evidence. 471 F.3d 902, 907 (8th Cir. 2006).

The ALJ's limitation with respect to Ms. Weber's physical limitations were similar to the opinion given by Dr. Steiner, the medical expert who reviewed the entire record. The ALJ's finding was also similar to Dr. Karayusuf, a psychiatrist who examined Ms. Weber. The ALJ properly took into account the limitations from her major depressive disorder and chronic pain syndrome according to 20 C.F.R. § 404.1520a. The ALJ took considered the social limitations that would result from these impairments. The ALJ properly found that there would be mild restrictions in daily living, yet also found that Ms. Weber was able to conduct herself in society. Ms. Weber is able to drive, cook, shop, watch tv, groom and bathe herself, play cards and games, talk on the phone, visit relative, handle finances, home school her son, houseclean, spend time on the computer and go out to eat or the movies. (Tr. at 21.) Ms. Frazin had noted that Ms. Weber's ability to relate to coworkers was very good and her ability to work with the public was good. (Tr. at 21.) Ms. Frazin also stated that her ability to maintain attention and concentration and ability to carry out instructions was good.

Thus, the ALJ properly took into account all evidence regarding Ms. Weber's RFC and made the proper determination.

D. <u>The Vocational Expert's Testimony was Properly Relied upon by the ALJ</u>

Ms. Weber argues that the ALJ improperly relied on the vocational expert's testimony because the vocational expert testified that he had not referenced the publication entitled Selected Characteristics of Occupations ("SCO").[7] The SCO is a companion publication to the Dictionary of Occupational Titles ("DOT") with regard to limitations involving stooping, crouching, kneeling and crawling. Ms. Weber argues that the ALJ was therefore not compliant with Social Security Ruling 00-4p. However, the vocational expert testimony stated that Ms. Weber could perform the job of conveyor belt according to DOT, but he could not verify whether the SCO described the jobs as requiring no stooping, crouching, kneeling, or crawling. (Tr. at 442.) The ALJ did not accept this portion of the testimony since the ALJ discounted Dr. Kioski's limitations regarding no stopping, crouching, kneeling or crawling. (Tr. at 25.) Thus, the vocational expert's opinion regarding what the SCO states about these limitations is not relevant.

The ALJ did ask the vocational expert whether his description of the jobs was consistent with the DOT, which the expert answered in the affirmative. (Tr. at 432-33.) There is nothing in that section of the expert's testimony to suggest that the vocational expert had not referenced the SCO with respect to those jobs which were consistent with the ALJ's limitations. The vocational

---

[7]The SCO is a publication that provides more detailed occupational data than that contained in the DOT. The SCO breaks up each job into twenty categories of physical demands, including strength, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, feeling, talking, hearing, tasting/smelling, near acuity, far acuity, depth perception, accommodation, color vision and field of vision. Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, U.S. Dept. of Labor, Employment and Training Administration, Appendix C1-C4 (1993). These categories are assessed based on the following four levels: N (not present), O (occasionally), F (frequently), and C (constantly). <u>Id.</u> at C-3.

expert identified three jobs that the ALJ accepted: room service clerk, machine tender, and press operator or tender (Tr. at 432.) She could perform over 11,000 jobs. (Tr. at 432.) According to the SCO, none of these jobs requires any stooping, kneeling, crouching, or crawling.  Therefore, it does not implicate SSR 00-4p.

Since the vocational expert did determine properly that Ms. Weber is capable of finding employment, the Court finds that the ALJ's decision is reasonable and proper.

## VI.   RECOMMENDATION

For the foregoing reasons, it is hereby recommended that:

1.  Plaintiff's Motion for Summary Judgment be **denied** [Docket No. 12];

2.  Defendant's Motion for Summary Judgment [Docket No. 15] be **granted**.


Dated: <u>January 7, 2008</u>                                    <u>s/ Arthur J. Boylan</u>
                                                                Arthur J. Boylan
                                                                 United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **January 18, 2008.**